UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEASHAM & KRAMER LLP, a California Limited Liability Partnership,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN NEFF, an individual,<br><br>Defendant. | No. 2:19-cv-00565-MCE-KJN<br><br>**MEMORANDUM AND ORDER** |

Through this action, Plaintiff Neasham & Kramer LLP ("Plaintiff") seeks to recover from Defendant Stephen Neff ("Defendant") fees Plaintiff contends it is owed for legal services. See First Amended Compl., ECF No. 33 ("FAC"). Presently before the Court is Defendant's Motion for Partial Summary Judgment. ECF No. 40 ("Def.'s Mot."). This matter has been fully briefed. ECF Nos. 54 ("Pl.'s Opp'n"), 57 ("Def.'s Reply"). For the reasons set forth below, Defendant's Motion is DENIED.[1]

///
///
///

---

[1] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. E.D. Local Rule 230(g).

1

# BACKGROUND

### A. Factual Background[2]

On March 17, 2015, Defendant contacted Plaintiff to discuss potentially retaining Plaintiff to advise Defendant in an employment termination and discrimination matter involving Defendant's former employer ("Company X").[3] The following day, on March 18, 2015, Plaintiff and Defendant entered into a Legal Representation Agreement (the "Agreement"). See generally Ex. 1, ECF No. 48-1, at 3–12. However, the Agreement specifically excluded representation in any lawsuit absent an amendment to the Agreement. Id. at 4. The Agreement further required Defendant to pay Plaintiff a $5,000 deposit and provided that invoices "are due and payable on receipt." Id. at 5–6. Finally, the Agreement provided Plaintiff a lien against any recovered amounts for unpaid fees. Id. at 7 (attaching lien to "any recovery Client may obtain, whether by arbitration award, judgment, settlement or otherwise.").

At the time the Agreement was signed, attorney Patricia Kramer ("Kramer") told Defendant that Plaintiff is a small firm that performs services in these types of cases on an hourly basis, and that if he was looking for a contingent fee arrangement, he would have to consult with a larger firm.[4] Defendant responded that he had consulted with other attorneys prior to consulting with Plaintiff. Ultimately, Defendant retained Plaintiff to provide legal services on an hourly basis.

///

---

[2] Unless otherwise stated, the following facts are assembled from Defendant's Statement of Undisputed Facts Concerning Defendant's Motion for Partial Summary Judgment, Plaintiff's Additional Material Facts and Supporting Evidence, and the parties' responses thereto. ECF Nos. 41, 54-1, 57-1.

[3] Pursuant to a post-trial settlement in the underlying state court action, Plaintiff and Defendant "agreed to refrain from further publicizing the [state court] trial" between Defendant and Company X. See ECF No. 31 ¶ 1; FAC ¶ 7 n.1. As a result, for purposes of this Motion, the parties and the Court refer to Defendant's former employer as "Company X."

[4] Defendant cites to Kramer's deposition testimony in support of his Motion, but Plaintiff raises a procedural objection on grounds that Defendant never filed the transcript on the docket. See ECF No. 55, at 3. Regardless, Plaintiff has filed the deposition transcript in support of its Opposition to the present Motion so the Court will thus consider it. See ECF No. 56.

2

The following facts are undisputed: Over the course of the litigation, Plaintiff informed Defendant that there were risks in pursuing litigation and trial but did not represent any outcome would occur and repeatedly advised Defendant that there was no guarantee regarding the outcome of his case matter. Defendant told Plaintiff that he understood that there were no guarantees regarding outcome and that Plaintiff's attorneys could stop telling him this. Plaintiff also informed Defendant that it was possible he could lose his case or that Defendant could win his case and either receive less than he desired as an outcome or the jury could award him his full damages.[5] Furthermore, Plaintiff told Defendant that at trial, Defendant was only entitled to his actual damages, not what he wanted or thought he should get. Regarding case timelines, Plaintiff informed Defendant that it did not control the court's calendar or when a trial date would be set. Plaintiff also discussed discovery, pleadings, law and motion, and dispositive motions with Defendant, and even provided Defendant with draft documents for review and sought Defendant's authorization to send them. Defendant was present at almost every day of depositions taken in the case. Trial preparation and damages were also discussed between the parties.

What is at dispute is whether Plaintiff charged reasonable fees for legal services rendered and whether Plaintiff represented the true costs of litigating Defendant's case through trial. See Def.'s Mot. at 2–3; Pl.'s Opp'n at 2–3. Plaintiff asserts that it sent Defendant detailed monthly statements describing its work on Defendant's case, see Ex. A, Kramer Decl., ECF Nos. 54-3, 54-4 (Plaintiff's billing statements between March 2015 and April 2018), but Defendant denies receiving such statements.[6] Neff Decl. ISO

---

[5] Defendant claims that Plaintiff "never informed [him] that [he] could win [his] case but still lose money because [Plaintiff] would charge [him] more than [he] would receive if [he] won." Neff Decl. ISO Reply, ECF No. 57-2 ¶ 9.

[6] Plaintiff raises evidentiary objections to Defendant's Exhibits 3, 5, 6, 8, 9, 10, and 16, which are Plaintiff's billing statements, "on the basis that [they] [are] only [] face sheet[s] and [are] [] incomplete exhibit[s]." See ECF No. 55, at 5–7; see Exs. 3, 5, 6, 8, 9, 10, 16, ECF No. 48-1 (listing, in part, outstanding balances). In support of its Opposition, Plaintiff has provided the full statements which list the tasks performed, the number of hours spent on each task, and the billing rates. See Ex. A, Kramer Decl., ECF Nos. 54-3, 54-4.

Reply, ECF No. 57-2 ¶ 6.  Furthermore, Defendant claims that Plaintiff never provided him with an evaluation of the merits of his case, an analysis of his likely potential recovery, or an estimate of the costs of litigation through trial.  See Neff Decl., ECF No. 42 ¶¶ 17, 21; Def.'s Statement of Undisputed Facts, ECF No. 41 ¶ 13 (claiming that Kramer "did not provide [Defendant] with any estimate as to what it might cost for [Plaintiff] to take [Defendant's] claims through trial.").  According to Plaintiff, it also regularly provided status updates to Defendant by email, phone, and in-person and discussed its case analysis, case strategy, and options with Defendant.  See generally Ex. A, Kramer Decl., ECF Nos. 54-3, 54-4 (listing multiple entries of Plaintiff's communications with Defendant).  The parties do not dispute that they regularly held phone conferences to provide Defendant with status updates on his case.  See, e.g., Ex. A, Kramer Decl., ECF No. 54-3, at 19 ("Telephone conference with [Defendant] regarding case status, strategy for settlement; discuss mitigation efforts.  Set recurring teleconference to update client.") (dated July 8, 2015); Kramer Dep., ECF No. 56, at 11 (stating that Kramer "set up a weekly meeting with [Defendant] on the – telephone meeting with him or status call time with the understanding that if there was something to talk about, [they] would talk."); Neff Decl. ISO Reply, ECF No. 57-2 ¶ 7 (no dispute that regular phone conferences were held).

      On March 26, 2015, Kramer delivered an initial settlement proposal to Company X on behalf of Defendant, but that demand was ultimately rejected.  At that time, Kramer had not formed any opinion as to a likely outcome of litigation.  Plaintiff subsequently filed suit on Defendant's behalf in June 2015.  By the end of June 2015, Defendant already accrued $11,390 in legal fees with an outstanding balance of $9,413.50.  Ex. 3, ECF No. 48-1, at 21; Ex. A, Kramer Decl., ECF No. 54-3, at 15.  Defendant asked Kramer whether he should pay the entire balance or if she would accept monthly payments of $4,000, and Kramer responded that Plaintiff would accept such payments.  However, by December 2015, Plaintiff's outstanding balance increased to $55,098.17.  Ex. 5, ECF No. 48-1, at 25; Ex. A, Kramer Decl., ECF No. 54-3, at 49.  Around this time,

Defendant told Kramer that he was starting a new business. Kramer Dep., ECF No. 56, at 38. Kramer testified at her deposition that, at that time, she was not concerned about how Defendant would pay his legal fees because "[h]e was paying $4,000 a month, and [Kramer] felt that was good faith at that point in time, and [they] were trying to support him." Kramer Dep., ECF No. 56, at 38–39. Furthermore, Kramer stated that she "had confidence in [Defendant's] claims, and [she] had confidence that [Defendant] was telling [her] the truth, that he would pay the bill if and when he could." Id. at 40.

By September 30, 2016, Plaintiff's outstanding balance had increased to $103,629.85. Ex. 6, ECF No. 48-1, at 27; Ex. A, Kramer Decl., ECF No. 54-3, at 95. On September 21, 2016, Kramer sent a lengthy internal email to other members of Plaintiff following a case management conference in Defendant's case in which she acknowledged that Defendant "wants the case to be over as soon as possible and it is costing him money that he doesn't have to prosecute the case." See Ex. 7, ECF No. 48-1, at 30. Defendant had informed Kramer that "he had never been so at risk financially with starting the new business, paying for litigation . . ." Id. Kramer confessed to the other members of Plaintiff that Defendant "is not hearing what [she] is telling him" and that she is "noticing that when [she] speak[s] to [Defendant] he keeps stating that [she] 'told him' before something that was different from what [she is] now telling him." Id. However, Kramer stated that she "always give[s] him the best information that [she has] at the time, but that cases are fluid and all kinds of factors affect when and how things happen and are heard by the court." Id. Beginning in October 2016, Defendant made payments of $2,000 per month instead of $4,000, claiming that his new "business was just getting going." Kramer Dep., ECF No. 56, at 52 (responding, "Send me what you can," when Defendant stated that he was going to pay $2,000 a month).

By May 31, 2017, Plaintiff's outstanding balance had reached $202,997.24. Ex. 9, ECF No. 48-1, at 35. At this point, it was unclear what it would cost to go to trial. Kramer Dep., ECF No. 56, at 54–55 ("At that time I didn't know how much it would cost us to go to trial."). In June 2017, Defendant and Company X participated in mediation,

during which time Plaintiff informed Defendant that it "expected trial could easily cost him $150,000 or more." Kramer Dep., ECF No. 56, at 59. However, Defendant rejected all offers to settle during mediation. By the end of June 2017, Defendant's outstanding balance was $312,290.25. Ex. 10, ECF No. 48-1, at 37. Kramer testified at her deposition that she discussed with Defendant how he would pay his legal bill should he lose at trial and that Defendant provided income projections and updates for his company Northern Nevada Care, Inc. ("NNCI"). Kramer Dep., ECF No. 56, at 63–64; see also Ex. A, Kramer Decl., ECF No. 54-4, at 69–70 (detailing notes from telephone conversation with Defendant on July 18, 2017). Based on this information, Kramer believed that Defendant was going to pay Plaintiff for its legal services. Id. at 64.

According to Plaintiff, Defendant asked Plaintiff to finance his case through trial. See, e.g., Kramer Dep., ECF No. 56, at 71 (quoting Defendant as saying, "Well, I can't finance the case. You guys are going to have to finance the case for me. . . . I'll give you more than what you would normally get."); but see Neff Decl. ISO Reply, ECF No. 57-2 ¶ 12 (stating that Defendant does not recall asking Plaintiff to finance his case through trial). For example, Defendant met with Kramer and her partner William Neasham ("Neasham") on August 23, 2017, to discuss trial costs. See Ex. A, Kramer Decl., ECF No. 54-4, at 75; Kramer Dep., ECF No. 56, at 67–68. Neasham told Defendant that Plaintiff is a small firm and that it did "not have the ability to bankroll and pay for court reporter fees and transcripts and jury fees and so on." Id. at 68. Kramer testified at her deposition that Defendant was not concerned about the additional costs and expected Plaintiff to pay those costs, even up to $100,000. Id. (quoting Defendant as saying, "Trust me, you're going to get paid everything that you are earning, and . . . you'll be able to recover it."); see also Ex. 11, ECF No. 48-1, at 40 (stating Defendant "was pretty cavalier to [Neasham] about having [Plaintiff] incur another $70,000–$100,000 to bear the cost and expense of trying th[e] case . . ."). Following the meeting with Defendant, on August 28, 2017, Neasham emailed Kramer, expressing concerns

///

6

1  about Defendant's outstanding bill and recommending that the Agreement be amended.
2  See id. at 39–41.
3        On September 6, 2017, Kramer spoke to Defendant by telephone and discussed,
4  in part, that to finance a trial, the Agreement needed to be amended. See Ex. E, ECF
5  No. 54-5, at 33. Kramer also advised Defendant to seek independent counsel to review
6  the proposed amendment. Id. at 34. One week later, on September 13, 2017, Kramer
7  sent Defendant a draft Second Amendment to the Agreement (the "Second
8  Amendment"). Ex. 13, ECF No. 48-1, at 46; see also Ex. 1, id., at 11–12 (incorporating
9  all other provisions of the Agreement dated March 18, 2015). The Second Amendment
10 created a hybrid fee structure, pursuant to which Plaintiff would be paid the higher of
11 either (1) their hourly fee or (2) 40% of the net proceeds of any settlement or award. Id.
12 at 11 (providing a fictitious example of contingent distribution); see also Ex. N, Brinitzer-
13 Graff Decl., ECF No. 54-5, at 139 ¶ 9 (stating Defendant "offered to pay [Plaintiff] either
14 its actual fees or 40% of the recovery, whichever amount was higher, if [Plaintiff] would
15 finance and continue representing him through trial.") (emphasis in original). Kramer had
16 already notified Defendant that, if he did not sign the Second Amendment, Plaintiff would
17 request a continuance of trial and substitute out of the case. Defendant claims that he
18 agreed to the Second Amendment simply because trial was set to begin in less than two
19 weeks and such a short timeline left him no choice but to agree. Neff Decl. ISO Reply,
20 ECF No. 57-2 ¶ 13.
21       On September 15, 2017, Company X served Defendant with an Offer to
22 Compromise in the amount of $400,000. See Ex. 14, ECF No. 48-1, at 49–52.
23 However, it is undisputed that Defendant rejected all settlement offers from Company X
24 prior to trial, including the Offer to Compromise and those made at the mandatory
25 settlement conference. Trial commenced on September 25, 2017, in South Lake Tahoe,
26 California. Counsel for both sides had to establish remote offices away from their
27 Folsom and Stockton, California, offices. Defendant was present each day of the trial.
28 After 18 trial days, the trial concluded on November 9, 2017, resulting in a jury verdict in

1  Defendant's favor.  See Ex. 15, ECF No. 48-1, at 54–68 (redacted).  The jury awarded
2  Defendant $715,782.50 for lost wages and $71,578.25 in punitive damages.  Plaintiff
3  had always been aware, and discussed with Defendant, that his damages would involve
4  tax withholdings.  On the same day as the jury verdict, Defendant "thanked the attorneys
5  for their hard work and told [them] 'not to worry' that although he knew that the firm was
6  advancing a lot of the money to try the case, he would pay his fees."  Lovelace Decl.,
7  ECF No. 54-5, at 149 ¶ 8 (declaration from Plaintiff's legal secretary during Defendant's
8  case).
9         Following the verdict, the parties and counsel for Company X reached an
10  agreement for the full payment of the judgment and costs in exchange for Company X
11  not filing an appeal, thus avoiding further law and motion practice.  See Ex. N, Brinitzer-
12  Graff Decl., ECF No. 54-5 ¶ 20; Neff Decl. ISO Reply, ECF No. 57-2 ¶ 25.  Essentially,
13  the case was ultimately settled for an amount more than Company X offered to pay in
14  settlement, but for less than Defendant offered to accept in settlement.  See Ex. O, Perry
15  Decl., ECF No. 54-5 ¶ 14; but see Neff Decl. ISO Reply, ECF No. 57-2 ¶ 26 (stating that
16  the case settled "for a gross amount more than [Company X] offered to pay in
17  settlement, but for a net amount to [Defendant] far less than [Company X] offered to pay
18  in settlement due to the unconscionable fees billed by [Plaintiff].") (emphases in original).
19         On November 21, 2017, Defendant emailed Plaintiff seeking advice on resolving
20  the tax consequences of the verdict.  See Ex. 17, ECF No. 48-1, at 72–75.  Defendant
21  indicated that the tax "results could not be more horrible."  Id. at 72.  He also stated that,
22  "[d]epending on what [they] work out on legal fees, [Defendant is] being taxed on way
23  more than [his] economic benefit (taxable income)."  Id.  Defendant also told Kramer that
24  he "hope[s] that [Kramer] ha[s] some ideas about how to improve the above situation."
25  Id.  Kramer referred Defendant to David Hellman ("Hellman"), a California certified tax
26  specialist, and Defendant retained him.  By the end of November 2017, Plaintiff's
27  outstanding bill was $618,715.59.  Ex. 16, ECF No. 48-1, at 70; Ex. A, Kramer Decl.,
28  ECF No. 54-4, at 112.

In December 2017, Defendant directly received a payroll check from Company X in the amount of $715,782.50 less withholdings. Kramer Decl., ECF No. 54-2 ¶ 45; see also Neff Decl. ISO Reply, ECF No. 57-2 ¶ 29 (receiving a check in the amount of $465,689.98). That same month, Defendant paid Plaintiff a total of $299,999.75, including $71,578 paid to Plaintiff's trust account directly by Company X and $193,421.75 paid by NNCI as advised by Hellman.

Defendant represented that he was sending Plaintiff a sum of $293,421.75 on December 18, 2017. In addition to the amounts Plaintiff received from Company X in December for costs and punitive damages, Plaintiff agreed to accept that amount, which would have brought the total payments in 2017 to $400,000 provided Defendant paid the rest in 2018. However, Defendant sent $100,000 less than what he represented and admitted that he deposited the funds from the settlement into his NNCI account. See id. ¶ 31 (stating Defendant was advised to do so by Hellman); Ex. M, Kramer Decl., ECF No. 54-5, at 130 (emails between Kramer and Defendant dated December 14 and 18, 2017). In response, Plaintiff claims it placed Defendant on notice that it held a lien on the amounts he received from Company X and that Plaintiff did not consent to Defendant's depositing of the funds into his NNCI account, but Defendant does not recall such notice. Kramer Decl., ECF No. 54-2 ¶ 51; Neff Decl. ISO Reply, ECF No. 57-2 ¶ 30. In any event, Defendant further represented that he would pay the $100,000 he had shorted to Plaintiff no later than March 31, 2018, but Defendant never paid that amount. On December 21, 2017, Defendant was sued by his former franchisor Brightstar. Neff Decl., ECF No. 42 ¶ 36 ("I did not retain counsel to represent me or my company in that dispute until the lawsuit was filed."); but see Def.'s Response Pl.'s Statement of Additional Material Facts, ECF No. 57-1 ¶ 61 (not disputing that Defendant "wanted to terminate his Brightstar Contract prior to December 2017.").

According to Plaintiff, its attorneys worked 2,113 hours and paralegals and law clerks worked 154 hours on Defendant's case. Plaintiff claims it never sought any fees other than to be paid for the work performed and that it regularly applied "no charged"

entries, reduced time entries for work actually performed, and provided courtesy discounts to Defendant.  In response, Defendant states he has no personal knowledge as to whether any of this is true.  See Neff Decl. ISO Reply, ECF No. 57-2 ¶ 14.  However, it is undisputed that Defendant told Plaintiff's attorneys and staff repeatedly before, during, and after trial that he would pay the full amounts of the fees he incurred even if he lost the case.  Def.'s Response Pl.'s Statement of Additional Material Facts, ECF No. 57-1 ¶ 57.  Defendant also undisputedly thanked Plaintiff repeatedly for its work on his case and even brought gifts to each of the staff members who worked on his case after he won at trial.  In sum, Defendant paid Plaintiff $426,082.58 over the course of the litigation.  See Kramer Decl., ECF No. 54-2 ¶ 46 (stating that Defendant "paid Plaintiff $375,132.62 in fees and $50,949.96 in costs.  ($35,000 of these costs were paid by [Company X] in addition to the amounts awarded by the jury.).")  However, Plaintiff claims Defendant still owes $334,707.13.

### B. Procedural History

Plaintiff filed this lawsuit on March 31, 2019, alleging causes of action for breach of contract, conversion, and fraud arising from Defendant's failure to pay the remaining fees owed.  ECF No. 1.  On May 15, 2020, Defendant filed his first motion to dismiss the entire complaint or, in the alternative, to dismiss the third cause of action, arguing that: (1) Plaintiff failed to comply with California's Mandatory Fee Arbitration Act ("MFAA"), and (2) Plaintiff failed to state a claim for fraud.  ECF No. 16.  The Court denied the motion on the MFAA ground but granted with leave to amend as to the fraud cause of action.  ECF No. 32.  On July 12, 2021, Plaintiff filed the operative FAC, to which Defendant filed an Answer and Counterclaim[7] against Plaintiff on October 25, 2021.  ECF Nos. 33, 39.  Defendant subsequently filed his second Motion to Dismiss the Third Cause of Action, which was denied on March 21, 2022.  ECF Nos. 34, 58.

///

---

[7] Defendant asserts the following counterclaims against Plaintiff:  (1) Declaratory Relief; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment; and (4) Breach of Fiduciary Duty.  See ECF No. 39, at 4–9.

On November 8, 2021, the deadline to file dispositive motions, Defendant filed the present Motion for Partial Summary Judgment, seeking adjudication in his favor on each of the three causes of action asserted in the FAC.  Defendant filed redacted versions of the following documents on that date:  (1) the Motion, (2) Defendant's Declaration in Support of his Motion ("Declaration"), and (3) a Statement of Undisputed Facts Concerning his Motion ("Statement of Undisputed Facts").  ECF Nos. 40–42.  The hearing on the Motion was noticed for February 10, 2022.  Pursuant to Local Rule 230, Plaintiff's Opposition was due fourteen (14) days and Defendant's Reply was due seven (7) days before the hearing date.  See E.D. Local Rule 230(c)–(d).

Prior to their filing, on October 13, 2021, Defendant filed his first notice of request to seal the three aforementioned documents in their entirety on grounds that they contain "confidential" information relating to the confidential settlement agreement between the parties and Company X in the underlying state court action.  ECF No. 38 (citing to the stipulated protective order).  The Court denied this first request without prejudice, finding that Defendant failed to establish that there is a compelling reason for sealing those documents in their entirety.  ECF No. 44.

Defendant filed a second request to seal those three documents in their entirety on November 16, 2021.  ECF No. 47.  Before the Court issued its decision on Defendant's second request, however, on December 2, 2021, Defendant filed a Notice of Errata, attaching 104 pages of redacted exhibits in support of his Motion.  ECF No. 48. The following day, on December 3, 2021, Defendant submitted for in camera consideration the transcript from Kramer's deposition referenced in his Statement of Undisputed Facts.  See ECF No. 50, at 2 n.4.  Plaintiff opposed the second request, arguing that the redacted versions of the Motion, Declaration, and Statement of Undisputed Facts filed on the docket are different from the unredacted versions Defendant submitted for in camera review and sought to seal.  Id. at 2.  Specifically, Plaintiff pointed out that (1) the redacted Motion contains only 18 pages and did not attach any exhibits or evidence whereas the unredacted Motion is 123 pages and

includes 19 exhibits, and (2) the deposition transcript was not timely submitted with the Motion or the first two requests to seal. Id. Ultimately, the Court denied the second request without prejudice because Defendant again failed to establish a compelling reason and did not explain whether the exhibits and deposition transcript "include[d] confidential information identified in the protective order let alone why all of them need to be sealed in their entirety." Id. at 3.

Defendant then filed a third notice of request to seal, again requesting that unredacted versions of the aforementioned documents be sealed in their entirety. ECF No. 51. The Court granted in part and denied in part Defendant's third request, concluding that wholesale sealing was unwarranted and ordering that the redacted versions of the Motion, Declaration, Statement of Undisputed Facts, and exhibits attached to the Notice of Errata to remain on the docket. ECF No. 53. In so doing, the Court stated that it would address the timeliness of Defendant's exhibits when reviewing the Motion on the merits. Id. at 2 n.4.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for

summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A.  Timeliness of Defendant's Exhibits

Before reaching the merits of Defendant's Motion, Plaintiff objects that Defendant's exhibits filed in support of his Motion were not timely filed on the docket and thus should not be considered. See ECF No. 55, at 2–3. As previously stated, Defendant filed his Motion on November 8, 2021, but his redacted exhibits were not filed on the docket until December 2, 2021. To date, Defendant has not provided any explanation as to why such exhibits were filed late. Although not timely filed on the docket, Defendant emailed Plaintiff the unredacted exhibits on October 13, 2021, well in advance of the November 8 filing date, and Plaintiff has not indicated that it suffered any prejudice in not being able to file an adequate opposition brief. Regardless of whether the exhibits are considered, however, Defendant ultimately fails to meet his burden in demonstrating that he is entitled to summary judgment on Plaintiff's claims. Accordingly, the Court declines to address the timeliness issue.

### B. First Cause of Action: Breach of Contract

Defendant first moves for summary judgment on Plaintiff's breach of contract claim.  See Def.'s Mot. at 11–14.  The standard elements for a breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for non-performance, (3) defendant's breach, and (4) damage to the plaintiff therefrom."  Abdelhamid v. Fire Ins. Exchange, 182 Cal. App. 4th 990, 999 (2010).  At issue here are the first and fourth elements.

As to the first element, Defendant argues that there is no valid and enforceable contract because the Agreement "constitutes an unconscionable fee agreement as a matter of law."  Def.'s Mot. at 13.  Specifically, Defendant claims that Plaintiff never informed him "that litigating this action through trial would cost several hundred thousand dollars . . ."  Id. at 12 ("Simply put, [Plaintiff] put Defendant in a no-win situation, where the only question was how much money [Defendant] would lose.").  In addition, Defendant asserts that the Second Amendment also renders the Agreement unconscionable because it was presented to Defendant less than two weeks before trial with Plaintiff "demand[ing] that [Defendant] either sign the Second Amendment or [Plaintiff] would immediately seek a continuance and withdraw."  Def.'s Mot. at 12 ("[Plaintiff] compounded their misconduct by again utterly failing to provide [Defendant] with any estimate on the costs of taking his case to trial . . .") (emphasis in original).  Ultimately, Defendant takes issue with the amount of attorneys' fees and costs charged.

The Court finds triable issues of fact as to whether Plaintiff informed Defendant about the attorneys' fees and costs and whether such fees are reasonable.  For example, Plaintiff has provided numerous billing statements detailing all the tasks performed in Defendant's case between March 2015 and April 2018, the number of hours expended, and the rates charged.  See Ex. A, Kramer Decl., ECF Nos. 54-3, 54-4.  Although Defendant claims he never received the full statements, Plaintiff says it provided them to Defendant.  See id.; Neff Decl. ISO Reply, ECF No. 57-2 ¶ 6.  It is also undisputed that the parties regularly communicated about the case.  See, e.g., Ex. A,

1  Kramer Decl., ECF No. 54-3, at 19; Neff Decl. ISO Reply, ECF No. 57-2 ¶ 7.
2  Additionally, Kramer testified at her deposition that, during the June 2017 mediation
3  between Defendant and Company X, Plaintiff informed Defendant that it "expected trial
4  could easily cost him $150,000 or more." Kramer Dep., ECF No. 56, at 59.  She further
5  testified that she discussed with Defendant how he would pay his legal bill should he
6  lose at trial and that Defendant provided income projections and updates for his
7  company NNCI, which demonstrated to Kramer that Defendant was going to pay Plaintiff
8  for its legal services. Id. at 63–64.  Kramer and Neasham also discussed trial costs with
9  Defendant on August 23, 2017, with both persons stating that Defendant did not seem
10 concerned about the costs and expected Plaintiff to provide the necessary funds.  See
11 Kramer Dep., ECF No. 56, at 67–68; Ex. 11, ECF No. 48-1, at 39–41.
12        Furthermore, it is undisputed that Defendant repeatedly told Plaintiff's attorneys
13 and staff before, during, and after trial that he would pay the full amounts of the fees
14 incurred even if he lost the case.  See Kramer Dep., ECF No. 56, at 71 (quoting
15 Defendant as saying, "Well, I can't finance the case.  You guys are going to have to
16 finance the case for me. . . .  I'll give you more than what you would normally get.");
17 Lovelace Decl., ECF No. 54-5, at 149 ¶ 8 (stating that Defendant acknowledged Plaintiff
18 was advancing money for the trial and told Plaintiff's attorneys and staff that he would
19 pay his fees).  There is also no dispute that Defendant rejected all offers of settlement
20 and wanted this case to proceed to trial.  Plaintiff worked on this case through discovery,
21 law and motion, mediation, settlement discussions, and through trial, which resulted in a
22 favorable jury verdict and post-trial settlement for Defendant.  The fact that Defendant
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

1 now takes issue with the amount of legal fees owed is insufficient to find that the entire
2 Agreement constitutes an unenforceable contract.[8]

3 Regarding the fourth element, Defendant argues that Plaintiff has failed to establish damages because Defendant has already paid Plaintiff fees which he believes are reasonable. See Def.'s Mot. at 13–14. As previously stated, Defendant repeatedly promised to pay his legal fees before, during, and after trial. Construing the evidence in a light most favorable to Plaintiff, assuming the Agreement is valid and the fees are reasonable, then Plaintiff has suffered damages, i.e., the outstanding balance Defendant has yet to pay for legal services rendered ($334,707.13). While Defendant has provided an expert report on the issue of damages, see Ex. 19, ECF No. 48-1, at 83–104 (opining that the fees charged by Plaintiff were unconscionable), Plaintiff has submitted detailed billing statements listing the work performed, hours expended, and rates charged during Defendant's case between March 2015 through April 2018.[9] See Ex. A, Kramer Decl., ECF Nos. 54-3, 54-4. Accordingly, summary judgment in Defendant's favor on Plaintiff's breach of contract claim is DENIED.

### C.   Second Cause of Action:  Conversion

Defendant next moves for summary judgment on Plaintiff's conversion claim which alleges that Defendant wrongfully converted $334,707.13 by not paying Plaintiff

---

[8] Defendant also argues that the Agreement is voidable because the Second Amendment does not meet the requirements of a contingency fee agreement under California Business and Professions Code § 6147, specifically that the agreement must contain "a statement that the fee is not set by law but is negotiable between attorney and client." Def.'s Mot. at 13 (citing Cal. Bus. & Prof. Code § 6147(a)(4)); see also Arnall v. Superior Ct., 190 Cal. App. 4th 360, 371 (2010) (applying § 6147's requirements to hybrid fee agreements). Failure to comply with any provision of § 6147 "renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." Cal. Bus. & Prof. Code § 6147(b). Plaintiff does not address this contention in its Opposition brief, and the Second Amendment does not include the required language. See Ex. 1, ECF No. 48-1, at 11. However, even if the Agreement is declared void, Plaintiff is still entitled to collect reasonable fees and the ultimate dispute in this case is whether the fees charged by Plaintiff for legal services rendered are in fact reasonable. Because there are triable issues of fact on this very point, the Court declines to grant summary judgment in Defendant's favor on such a contention.

[9] The Court recognizes Plaintiff's objection to Defendant's expert report as inadmissible hearsay and Defendant's assertion that Plaintiff has not provided its own expert witness on the issue of damages. See Pl.'s Opp'n at 7–8; Def.'s Mot. at 13–14. Regardless, even considering Defendant's report, the Court finds that Plaintiff has provided sufficient evidence on the damages question to survive summary judgment.

17

for outstanding legal fees.  See Def.'s Mot. at 14–15; FAC ¶¶ 59–69.  To show conversion, a plaintiff must prove three elements:  "(1) plaintiffs' ownership or right to possession of the property at the time of the conversion; (2) defendants' conversion by a wrongful act or disposition of plaintiffs' property rights; and (3) damages."  Tyrone Pac. Int'l, Inc. v. MV Eurychili, 658 F.2d 664, 666 (9th Cir. 1981).  Conversion is also a strict liability claim, and a defendant's state of mind is therefore irrelevant in determining liability.

To the extent Defendant reasserts that the Agreement is not a valid contract and that Plaintiff charged unconscionable fees, those arguments fail for the reasons previously discussed.  Defendant also argues that he never "possessed or controlled the amounts alleged to have been converted."  Def.'s Mot. at 15.  However, it is undisputed that he received a check from Company X in the amount of $465,689.98 and that Defendant deposited those funds into the NNCI account.  See Neff Decl. ISO Reply, ECF No. 57-2 ¶¶ 29, 31; Ex. M, Kramer Decl., ECF No. 54-5, at 130 (emails between Kramer and Defendant dated December 14 and 18, 2017).  Defendant also represented that he was sending Plaintiff a sum of $293,421.75 on December 18, 2017, but he undisputedly sent $100,000 less and to date has not paid that remaining amount. As a result, summary judgment on Plaintiff's conversion claim is DENIED.

### D.     Third Cause of Action:  Fraud

Lastly, Defendant moves for summary judgment on Plaintiff's fraud claim.  See Def.'s Mot. at 15–17.  Under California law, the elements of fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  Lazar v. Superior Ct., 12 Cal. 4th 631, 638 (1996).

In the FAC, Plaintiff alleges that, before and during the trial, Defendant "specifically represented that his company NNCI was profitable and would be even more profitable in the succeeding fiscal year (2018) and that he would have the funds to pay

[Plaintiff] regardless of outcome if [Plaintiff] continued representing him," but "[t]hose statements were false." FAC ¶¶ 72–74. Furthermore, the FAC alleges that on December 14, 2017, when he promised to pay $400,000 in 2017 and the remaining balance in 2018, Defendant "knew that this statement was false because he had direct knowledge of his finances and intended to withhold payment to [Plaintiff] in order to infuse his business with cash flow and pay for other pending litigation." Id. ¶¶ 78–79. According to Defendant, these statements have been disproven because Defendant "was not sued by [his] former franchisor until December 21, 2017, and [he] did not retain counsel to represent [him] or [his] company in that dispute until the lawsuit was filed." Neff Decl., ECF No. 42 ¶ 36. Furthermore, Defendant claims that Plaintiff was aware of his struggling financial situation and thus any reliance on his allegedly fraudulent statements were unreasonable. Def.'s Mot. at 16–17.

The evidence before the Court on summary judgment illustrates a genuine dispute of material fact as to whether Defendant "committed fraud by promising to pay all of [Plaintiff's] bills but ultimately failing to do so." Def.'s Mot. at 15. In September 2016, Kramer acknowledged Defendant's concerns that the case "is costing him money that he doesn't have to prosecute the case" and that "he had never been so at risk financially with starting the new business, paying for litigation . . ." Ex. 7, ECF No. 48-1, at 30. It is also undisputed that Defendant was originally making monthly payments of $4,000, but by October 2016, he was only paying $2,000 a month. See Kramer Dep., ECF No. 56, at 38–39; Pl.'s Response Def.'s Statement of Undisputed Facts, ECF No. 54-1 ¶ 35 ("Undisputed that [Defendant] began paying $2,000 per month in October 2016.").

While such evidence supports Defendant's position, there is undisputed evidence demonstrating Defendant repeatedly promised before, during, and after trial that he would pay his outstanding fees regardless of outcome. See Def.'s Response Pl.'s Statement of Additional Material Facts, ECF No. 57-1 ¶ 57. For example, Kramer testified at her deposition that she discussed with Defendant how he would pay his legal bill should he lose at trial and that Defendant provided income projections and updates

for NNCI.  See Kramer Dep., ECF No. 56, at 63–64.  Additionally, during a meeting with Kramer and Neasham in which they discussed financing the case through trial, Defendant stated, "Trust me, you're going to get paid everything that you are earning, and . . . you'll be able to recover it."  Id. at 68.  After receiving a favorable jury verdict, Defendant told Plaintiff's attorneys and staff "not to worry" and that "although he knew that the firm was advancing a lot of the money to try the case, he would pay his fees."  Lovelace Decl., ECF No. 54-5, at 149 ¶ 8 (declaration from Plaintiff's legal secretary during Defendant's case).  Finally, on December 17, 2018, Defendant represented to Plaintiff that he was sending $293,421.75 but he actually sent $100,000 less and to date has not paid that amount.

Construing the evidence in a light most favorable to Plaintiff, the Court finds triable issues of fact as to whether Defendant falsely represented that he would pay all legal fees owed.  As such, Defendant's Motion as to the fraud claim is DENIED.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment, ECF No. 40, is DENIED.

IT IS SO ORDERED.

Dated:  May 25, 2022

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE